**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| BIONOL CLEARFIELD, LLC, *et al.*,[1] | : | Case No. 11-12301 (PJW) |
| | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Hearing Date: TBD** |
| | : | **Objection Date: TBD** |

**CHAPTER 7 TRUSTEE'S MOTION FOR AUTHORITY TO OPERATE THE
DEBTORS' BUSINESS FOR A LIMITED TIME PURSUANT TO 11 U.S.C. § 721**

Alfred T. Giuliano (the "Trustee"), chapter 7 trustee for the jointly administered estates of Bionol Clearfield, LLC, *et al.* (the "Debtors" or the "Company"), hereby requests entry of an order for authority to operate the Debtors' business for a limited time pursuant to 11 U.S.C. § 721 (the "Motion"). In support of the Motion, the Trustee respectfully states as follows:

**Jurisdiction**

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

2. Venue of these proceedings and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicate for the relief sought herein is 11 U.S.C. § 721.

---

[1] The Debtors are the following entities: Bionol Clearfield, LLC a Pennsylvania limited liability company (Fed. EIN 06-1792058), Bionol Clearfield Holdco, LLC, a Delaware limited liability company (Fed. EIN 26-0663473), and BioEnergy Holding, LLC (Fed. EIN 26-0290248).

**Background**

4. On July 20, 2011 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

5. On July 20, 2011, the Trustee was appointed by the Office of the United States Trustee as Chapter 7 Trustee in these cases.

**The Debtors' Business & Events Leading to Bankruptcy**

6. Debtor Bionol Clearfield, LLC ("Bionol") is a limited liability company organized in the Commonwealth of Pennsylvania ("Pennsylvania") and engaged in the production and sale of fuel-grade, corn-based ethanol and its by-products, wet and dry distillers grain with soluables ("DDGS"). Ethanol is used as: (i) an octane enhancer in fuels; (ii) an oxygenated fuel additive for the purpose of reducing ozone and carbon monoxide vehicle emissions; and (iii) a non-petroleum based gasoline substitute. DDGS consists of the non-fermentable components of corn remaining after ethanol is distilled from fermented corn mash. DDGS is primarily used as a high-protein, high-energy animal feed supplement in the dairy, beef, swine and poultry industries.

7. Bionol is a wholly-owned subsidiary of debtor Bionol Clearfield Holdco LLC ("Bionol Holdco"), a Delaware limited liability company, which in turn is a wholly-owned subsidiary of debtor BioEnergy Holding LLC, a Delaware limited liability company ("BioEnergy Holding"). The Debtors were created in 2006, when BioEnergy International, LLC ("BioEnergy International"), an affiliate of Myriant Technologies LLC, and certain co-investors contributed cash and obtained the debt, equity, and government financing necessary to construct and operate an ethanol plant on approximately 34 acres in Clearfield, Pennsylvania (the "Facility").

2

8. On September 28, 2006, before construction of the Facility commenced, Bionol and Getty Petroleum Marketing Inc. ("Getty") entered into a take-or-pay tolling contract (the "Getty Contract") with a 5-year term starting from the date the Facility became operational. Under the Getty Contract, Getty agreed to purchase all of the Facility's ethanol at a set price pursuant to a formula established by Getty (the "Getty Contract Formula"). Under the Getty Contract Formula, Getty took on the risk of key commodity costs, including corn, natural gas, and denaturant, while the Debtors assumed the construction and operating risks.

9. The relative certainty provided by the Getty Contract served to attract the additional investors and financing necessary to construct and operate the Facility. In particular, Bionol was able to raise over $277 million in financing, including approximately $68 million in tax exempt bonds and over $6 million in direct loans from Pennsylvania (the Debtors' outstanding indebtedness is described in further detail below). Additionally, Pennsylvania provided over $15 million in grants to the Debtors.

10. Construction of the Facility began in 2008 and commercial operations started in the first calendar quarter of 2010. The Facility produces 110 million gallons of ethanol per year and approximately 310,000 tons of DDGS. Bionol generates all of its revenue from the sale of these products.

11. Subsequent to the execution of the Getty Contract, the market price of corn rose and the market price of ethanol fell dramatically, with the consequence that the Getty Contract Formula would no longer be favorable for Getty. On June 1, 2010, Getty informed Bionol that, despite the terms of the Getty Contract, it would only purchase ethanol from Bionol based on a new formula (the "Getty Modified Formula"). The Getty Modified Formula pricing was substantially lower than the Getty Contract Formula pricing. Moreover, starting in November

3

2010, the Getty Modified Formula resulted in a price that was less than the price that was otherwise available on the open market. Accordingly, Bionol ceased selling ethanol to Getty at that time and instead began selling its ethanol to third parties, including gasoline refining and distribution companies, at the market price.

12. According to the Debtors, despite Bionol's diligent efforts to mitigate damages, Getty's breach of the Getty Contract caused past and future damages to Bionol of more than $230 million.

13. As a result of Getty's repudiation of the Getty Contract and the critical issues that arose between the parties involving the Getty Contract, Getty filed arbitration claims against Bionol pursuant to the Getty Contract with the American Arbitration Association (the "AAA") (Proceeding No. 50 198 T 00398 10) and Bionol responded with defenses and counterclaims, to which Getty filed defenses. After a lengthy hearing before the AAA Panel of Arbitrators (the "AAA Panel"), during which both parties presented extensive evidence in support of their respective claims and defenses, both Getty and Bionol submitted post-hearing briefs on May 18, 2011. On July 22, 2011, litigation counsel for Bionol was served with the AAA Panel's Award, dated July 18, 2011, wherein the AAA Panel awarded as follows: (a) the AAA Panel found in favor of Bionol on all of Getty's claims, and (b) the AAA Panel found in favor of Bionol on all of its claims against Getty and ordered Getty to pay $230,382,745 within thirty (30) days of the date of the award. One member of the three member AAA Panel filed a Dissenting Opinion and Award, which recommended an award to Bionol of $22,600,000.

14. According to Bionol, it estimates that, as of December 31, 2010, the Company's unaudited consolidated assets totaled approximately $115 million and unaudited consolidated liabilities totaled approximately $218 million. The Company further estimates that its unaudited

consolidated revenues for the twelve months ended December 31, 2010 were approximately $205 million.

15. According to the Debtors, as of the Petition Date, the Debtors estimate that the Debtors have approximately $319 million of outstanding long-term debt on a consolidated basis, approximately as follows:

- $138 million in loans, interest, and other amounts owed (the "Loan") under that certain Senior Credit Agreement, dated as of February 6, 2008 (together with all amendments, related agreements and documents, the "Term Loan Facility"), among Bionol, TD Banknorth, N.A. ("TD Bank"), as administrative agent, and the other banks and lending institutions party thereto. The Loan issued under the Term Loan Facility include:

    o $71 million in aggregate principal amount of Tranche A secured 3.5% senior notes, issued pursuant to the Term Loan Facility on February 6, 2008.

    o $35 million in aggregate principal amount of Tranche B secured 5% senior notes, issued pursuant to the Term Loan Facility on February 6, 2008.

    o $30 million in aggregate principal amount of Tranche C secured 7% senior notes, issued pursuant to the Term Loan Facility on February 6, 2008.

    o A Working Capital Loan Facility not to exceed $4 million (subject to an increase) pursuant to which letters of credit may be issued.

- $68 million in principal, interest, and other amounts owed on account of Pennsylvania Tax-exempt secured 8.5% senior notes due August 14, 2011, issued by the Commonwealth of Pennsylvania on February 6, 2008, pursuant to that certain Indenture, dated as of January 1, 2008, among Bionol and Wells Fargo Bank, N.A., as Indenture Trustee.

- $6.4 million in principal, interest, and other amounts owed under the subordinate secured Pennsylvania State Loan Funds, including:

    o $2.75 million as original principal amount under that certain Machinery and Equipment Loan Fund Loan Agreement, dated as of February 6, 2008, among Bionol and the Commonwealth of Pennsylvania, acting by and through the Department of Community and Economic Development.

    o $1.25 million as original principal amount under that certain Infrastructure Development Loan Agreement, dated as of February 6, 2008, among

> Bionol and the Commonwealth of Pennsylvania, acting by and through the Department of Community and Economic Development.
>
> o $2.25 million as original principal amount under that certain Loan Agreement, dated as of February 6, 2008, among Bionol, Clearfield County Economic Development Corporation, and the Pennsylvania Industrial Development Authority.
>
> - $111 million in principal, interest, and other amounts owed as original principal amount under certain Senior Secured Notes, dated as of August 15, 2007, issued by BioEnergy Holding and secured by the assets of BioEnergy Holding, payable in varying amounts to each of the co-investors other than BioEnergy International. Neither Bionol nor Bionol Holdco are obligors under these notes.

16. In addition to the foregoing long-term debt, according to the Debtors' schedules filed in these cases the Debtors have approximately $473,106.60 in outstanding unsecured priority liabilities, which includes $20,991.29 for earned, unpaid vacation time, and $452,115.31 for unpaid property taxes; and $14,671,298.53 in outstanding unsecured non-priority liabilities.

17. The negative effects of the breach by Getty and the necessity to sell ethanol to third parties were compounded by the current high corn prices (which have soared to an all time high) and low ethanol prices compelled the Debtors to explore restructuring alternatives with its stakeholders. By June 2011, it became evident that an out of court restructuring or a reorganization or liquidation through chapter 11 would not be viable for the Debtors. Therefore, in order to minimize cash drain and to maximize the going concern value of the Debtors' business, the Debtors placed the Facility into a "hot idle" on or about June 9, 2011. Under a "hot idle" status, the Debtors ceased corn processing and ethanol production but continued to maintain the Facility in such a state that it is ready to begin processing and production quickly. As of the Petition Date, the Debtors have approximately 55 employees that are employed with the Debtors to maintain the Facility in its current "hot idle" status. Soon after the idling of the Facility, and with no alternatives, the Debtors filed the present chapter 7 cases.

6

18. Since the Petition Date and the Trustee's appointment, the Trustee has been analyzing the Debtors' assets, liabilities and the operations of their business, as well as the alternatives for the liquidation of the Debtors estates. In addition, the Trustee has engaged in discussions with TD Bank with respect to the Debtors' business and liquidation alternatives, including potential use of cash collateral on a consensual basis in order to fund a sale process of the Debtors' assets as a going concern. The Trustee has determined in conjunction with his professionals and advisors, that at this time the greatest potential to maximize the value of the Debtors assets is to implement a process for the sale of the Debtors' assets as a going concern, with funding to be provided under a cash collateral arrangement with the Debtors' senior secured lenders under the Term Loan Facility. In order to implement this strategy, the Trustee must operate the Debtors' business and maintain the current "hot idle" status of the Facility.

### Relief Requested

19. By and through this Motion, the Trustee seeks authority, pursuant to section 721 of the Bankruptcy Code, to operate the Debtors' business for a limited time in order to initiate, conduct and conclude a sale process for the sale of the Debtors' assets as a going concern.

### Basis for Relief Requested

20. Section 721 of the Bankruptcy Code provides that "[t]he court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." 11 U.S.C. § 721. Authority to operate a business in a chapter 7 proceeding is appropriate "in a limited number of situations, *such as where it appears that a business could be sold for a greater price as a going concern than would be obtained in ordinary liquidation.*" *In re A&T Trailer, Inc.,* 53 B.R. 144, 147 (Bankr. D. Wyo. 1985); *In re Lason, Inc.,* 300 B.R. 227, 233 (Bankr. D. Del. 2003)

(recognition that liquidation in chapter 7 may occur under "forced sale" conditions or as a going concern with section 721 authority).

21. The statutory option for a chapter 7 trustee to run a debtor's business on a limited basis contemplates circumstances where preserving assets pending a future sale may result in an increased benefit to the estate as opposed to an immediate cessation of operations and piecemeal liquidation. *See, e.g., In re Quarter Moon Livestock Co.,* 116 B.R. 775, 782 (Bankr. D. Idaho 1990) (authorizing trustee to operate debtor's cattle business "to wait until fall roundup and sell the cattle heard, and to maintain livestock until that time"). The Court has discretion in considering requests to operate a debtor's business under section 721. *In re Heissinger Res. Ltd.,* 67 B.R. 378, 384 (C.D. Ill. 1986).

22. In these cases, the Trustee's authority for operating the Debtors' business will be limited to preservation of the Debtors' assets, including the Facility, in order to conduct a sale process. The Trustee, with the assistance of his advisors and the Debtors' management, will operate the Debtors' assets strictly in order to maintain the current "hot level" status of the facilities and will undertake whatever administrative tasks are incident thereto, including, payment of current employee's wages and benefits. The Debtor's employees and management will continue in their prepetition roles with the Debtors and will manage and operate the Facility on a day-to-day basis in order to maintain its current "hot level" status. In addition, the Trustee will undertake his traditional duties with respect to implementing, conducting and concluding a sale process for the Debtors' business. As discussed above, the Trustee is in active negotiations with the Debtors' senior prepetition lenders, through TD Bank, concerning the consensual use of cash collateral to fund the limited operations of the Debtors' business as outlined herein.

8

23. Aside from those administrative matters and consultation with Debtors' management in order to maintain the Debtors' assets in their current state, the Trustee does not anticipate the need for expanded operating authority. It is not expected that any new sale contracts of any kind (other than any agreements related to a sale of the Debtors' assets) will be negotiated or accepted; no expansion of the current operations of the Debtors' business will be necessary; and no corn processing or production of ethanol will restart.

24. Limited authority for the Trustee to operate the Debtors' business as outlined in this Motion will maximize value to the estate and will allow the Trustee to market the Debtors' assets, conduct a robust sale process for the ultimate sale of the Debtors' assets as a going concern. A piecemeal liquidation of the Debtors' assets will most likely result in diminished returns for the Debtors' estates, because the Facility is currently in a turn-key "hot idle" state and is ready for a going concern sale, whereas piecemeal liquidation would mean the dismantling of the Debtors' business and assets and numerous individual fire sales of assets.

25. At this time, the Trustee is not in a position to predict how long the sale process will need to be in order to achieve a successful result. Therefore, in consultation with the Office of the United States Trustee, the Trustee will fulfill his obligations under section 704(a)(8) and will provide and file periodic reports and summaries of the operation of the Debtors' business, including a statement of receipts and disbursements.

26. Therefore, based on the foregoing, the Trustee submits that grounds exist for granting the Trustee authority to operate the Debtors' business for a limited period and that such authority is in the best interests of the Debtors, their creditors and their estates.

## Notice

27. Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel to the TD Bank, as administrative agent for the Debtors' lenders under the Term Loan Facility, (iii) all other known secured creditors of the Debtors, (iv) Debtor Bionol Clearfield's 20 largest unsecured creditors (including counsel if known)[2], and (v) all parties requesting notices pursuant to Bankruptcy Rule 2002. The Trustee submits that no other or further notice need be provided.

WHEREFORE, the Trustee respectfully requests entry of an order (i) approving the Motion, (ii) granting the Trustee authority to operate the Debtors business for a limited period pursuant to section 721 of the Bankruptcy Code, and (iii) granting the Trustee such other and further relief as the Court deems just and proper.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By: _/s/ Sheldon K. Rennie_
Sheldon K. Rennie, Esquire
Delaware Bar No. 3772
919 N. Market Street, Suite 1300
Wilmington, DE 19801-3046
(302) 654-7444/Fax (302) 656-8920
srennie@foxrothschild.com

-and-

Michael G. Menkowitz, Esquire
Joshua T. Klein, Esquire
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2000/Fax (215) 299-2150
mmenkowitz@foxrothschild.com
jklein@foxrothschild.com

Proposed counsel for Alfred T. Giuliano, Chapter 7 Trustee for the estates of Bionol Clearfield, LLC, *et al.*

Dated: July 27, 2011

---

[2] The other Debtors' filings in these Cases reflect that they do not have any unsecured creditors.