# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| BIONOL CLEARFIELD, LLC, *et al.*,[1] | : | Case No. 11-12301 (PJW) |
| | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Hearing Date: TBD** |
| | : | **Objection Date: TBD** |

**CHAPTER 7 TRUSTEE'S MOTION FOR ORDER APPROVING
STIPULATION AND INTERIM ORDER (I) AUTHORIZING THE USE OF
LENDERS' CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION
PURSUANT TO 11 U.S.C. §§ 361 AND 363 AND (III) SCHEDULING
A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)**

Alfred T. Giuliano (the "Trustee"), Chapter 7 Trustee for the jointly administered estates of Bionol Clearfield, LLC, Bionol Clearfield Holdco, LLC, and BioEnergy Holding, LLC (collectively, the "Debtors" or the "Company"), hereby files this motion (the "Motion") pursuant to Section 363(c) of Title 11, United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for (A) entry of a stipulation and interim order (the "Interim Order") (i) authorizing the Trustee's use of Cash Collateral (as defined below), (ii) providing adequate protection to the interests of the Lenders (as defined below), and (iii) granting related relief; and (B) scheduling a final hearing. In support of the Motion, the Trustee respectfully states as follows:

## Jurisdiction

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).

---

[1] The Debtors are the following entities: Bionol Clearfield, LLC a Pennsylvania limited liability company (Fed. EIN 06-1792058), Bionol Clearfield Holdco, LLC, a Delaware limited liability company (Fed. EIN 26-0663473), and BioEnergy Holding, LLC (Fed. EIN 26-0290248).

2. Venue of these proceedings and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicate for the relief sought herein is sections 105, 361, 362 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b).

**Background**

4. On July 20, 2011 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

5. On July 20, 2011, the Trustee was appointed by the Office of the United States Trustee as Chapter 7 Trustee in these cases.

**The Debtors' Business & Events Leading to Bankruptcy**

6. Debtor Bionol Clearfield, LLC ("Bionol") is a limited liability company organized in the Commonwealth of Pennsylvania ("Pennsylvania") and engaged in the production and sale of fuel-grade, corn-based ethanol and its by-products, wet and dry distillers grain ("DGS"). Ethanol is used as: (i) an octane enhancer in fuels; (ii) an oxygenated fuel additive for the purpose of reducing ozone and carbon monoxide vehicle emissions; and (iii) a non-petroleum based gasoline substitute. DGS consists of the non-fermentable components of corn remaining after ethanol is distilled from fermented corn mash. DGS is primarily used as a high-protein, high-energy animal feed supplement in the dairy, beef, swine and poultry industries.

7. Bionol is a wholly-owned subsidiary of debtor Bionol Clearfield Holdco LLC ("Bionol Holdco"), a Delaware limited liability company, which in turn is a wholly-owned subsidiary of debtor BioEnergy Holding LLC, a Delaware limited liability company ("BioEnergy

2

Holding"). The Debtors were created in 2006, when BioEnergy International, LLC ("BioEnergy International"), an affiliate of Myriant Technologies LLC, and certain co-investors contributed cash and obtained the debt, equity, and government financing necessary to construct and operate an ethanol plant on approximately 34 acres in Clearfield, Pennsylvania (the "Facility").

8. On September 28, 2006, before construction of the Facility commenced, Bionol and Getty Petroleum Marketing Inc. ("Getty") entered into a take-or-pay tolling contract (the "Getty Contract") with a 5-year term starting from the date the Facility became operational. Under the Getty Contract, Getty agreed to purchase all of the Facility's ethanol at a set price pursuant to a formula established by Getty (the "Getty Contract Formula"). Under the Getty Contract Formula, Getty took on the risk of key commodity costs, including corn, natural gas, and denaturant, while the Debtors assumed the construction and operating risks.

9. The relative certainty provided by the Getty Contract served to attract the additional investors and financing necessary to construct and operate the Facility. In particular, Bionol was able to raise over $277 million in financing, including approximately $65 million in tax exempt bonds and over $6 million in direct loans from Pennsylvania (the Debtors' outstanding indebtedness is described in further detail below). Additionally, Pennsylvania provided over $15 million in grants to the Debtors.

10. Construction of the Facility began in 2008 and commercial operations started in the first calendar quarter of 2010. The Facility produces 110 million gallons of ethanol per year and approximately 310,000 tons of DGS. Bionol generates all of its revenue from the sale of these products.

11. Subsequent to the execution of the Getty Contract, the market price of corn rose and the market price of ethanol fell dramatically, with the consequence that the Getty Contract

3

Formula would no longer be favorable for Getty. On June 1, 2010, Getty informed Bionol that, despite the terms of the Getty Contract, it would only purchase ethanol from Bionol based on a new formula (the "Getty Modified Formula"). The Getty Modified Formula pricing was substantially lower than the Getty Contract Formula pricing. Moreover, starting in November 2010, the Getty Modified Formula resulted in a price that was less than the price that was otherwise available on the open market. Accordingly, Bionol ceased selling ethanol to Getty at that time and instead began selling its ethanol to third parties, including gasoline refining and distribution companies, at the market price.

12. According to the Debtors, despite Bionol's diligent efforts to mitigate damages, Getty's breach of the Getty Contract caused past and future damages to Bionol of more than $230 million.

13. As a result of Getty's repudiation of the Getty Contract and the critical issues that arose between the parties involving the Getty Contract, Getty filed arbitration claims against Bionol pursuant to the Getty Contract with the American Arbitration Association (the "AAA") (Proceeding No. 50 198 T 00398 10) and Bionol responded with defenses and counterclaims, to which Getty filed defenses. After a lengthy hearing before the AAA Panel of Arbitrators (the "AAA Panel"), during which both parties presented extensive evidence in support of their respective claims and defenses, both Getty and Bionol submitted post-hearing briefs on May 18, 2011. On July 22, 2011, litigation counsel for Bionol was served with the AAA Panel's Award, dated July 18, 2011, wherein the AAA Panel awarded as follows: (a) the AAA Panel found in favor of Bionol on all of Getty's claims, and (b) the AAA Panel found in favor of Bionol on all of its claims against Getty and ordered Getty to pay $230,382,745 within thirty (30) days of the

4

date of the award. One member of the three member AAA Panel filed a Dissenting Opinion and Award, which recommended an award to Bionol of $22,600,000.

14. According to Bionol, it estimates that, as of December 31, 2010, the Company's unaudited consolidated assets totaled approximately $115 million and unaudited consolidated liabilities totaled approximately $218 million. The Company further estimates that its unaudited consolidated revenues for the twelve months ended December 31, 2010 were approximately $205 million.

15. Pursuant to the Senior Credit Agreement, dated as of February 6, 2008 (together with all amendments, supplements and modifications, the "Credit Agreement"), among Bionol Clearfield, LLC ("Bionol"), TD Bank, N.A., as administrative agent and as collateral agent (in such capacities, the "Agent"), and the lenders party from time to time thereto (the "Lenders"), the Lenders made credit available to Bionol. All amounts owing by the Debtors in connection with the Credit Agreement are hereinafter referred to as the "Prepetition Obligations". Furthermore, pursuant to the Assignment and Security Agreement; the Accounts Agreement; the Fee and Leasehold Mortgage, Security Agreement, Financing Statement, Fixture Filing and Assignment of Leases and Rents; and the Pledge and Security Agreement, as each of the foregoing has been amended, supplemented and otherwise modified to date (the "Security Documents"), the Prepetition Obligations are secured by liens and security interests upon and in substantially all of the assets and property of Bionol, including without limitation, accounts, chattel paper, real property, deposit accounts, documents, equipment, fixtures, general intangibles, instruments, intellectual property, inventory, investment property and proceeds (collectively the "Prepetition Collateral"). Included as part of the Prepetition Collateral, is all cash amounts on deposit in the Debtors' accounts, including, the Revenue Account, Construction

5

Account, Working Capital Reserve Account, Operating Account and Debt Service Reserve Account maintained by the Agent or its affiliate constitute Prepetition Collateral or the proceeds of Prepetition Collateral and, therefore, is the cash collateral of the Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

16. The negative effects of the breach by Getty and the necessity to sell ethanol to third parties were compounded by the current high corn prices (which have soared to an all time high) and low ethanol prices compelled the Debtors to explore restructuring alternatives with its stakeholders. By June 2011, it became evident that an out of court restructuring or a reorganization or liquidation through chapter 11 would not be viable for the Debtors. Therefore, in order to minimize cash drain and to maximize the going concern value of the Debtors' business, the Debtors placed the Facility into a "hot idle" on or about June 9, 2011. Under a "hot idle" status, the Debtors ceased corn processing and ethanol production but continued to maintain the Facility in such a state that it is ready to begin processing and production quickly. As of the Petition Date, the Debtors have approximately 55 employees that are employed with the Debtors to maintain the Facility in its current "hot idle" status. Soon after the idling of the Facility, and with no alternatives, the Debtors filed the present chapter 7 cases.

17. Since the Petition Date and the Trustee's appointment, the Trustee has been analyzing the Debtors' assets, liabilities and the operations of their business, as well as the alternatives for the liquidation of the Debtors estates. In addition, the Trustee has engaged in discussions with TD Bank with respect to the Debtors' business and liquidation alternatives, including potential use of cash collateral on a consensual basis in order to fund a sale process of the Debtors' assets as a going concern. The Trustee has determined in conjunction with his professionals and advisors, that at this time the greatest potential to maximize the value of the

6

Debtors assets is to implement a process for the sale of the Debtors' assets as a going concern, with funding to be provided under a Cash Collateral arrangement with the Debtors' senior secured lenders under the Term Loan Facility. In order to implement this strategy, the Trustee must operate the Debtors' business and maintain the current "hot idle" status of the Facility. Accordingly, the Trustee has filed a motion seeking authority to operate the Debtors' business pursuant to section 721 of the Bankruptcy Code. Authority to use Cash Collateral is integral to the Trustee's efforts for a successful sale process and maximizing value for the Debtors' estates. As of the Petition Date, the Debtors had approximately $2.9 million dollars in cash in various accounts, which constitutes Cash Collateral. Specifically, all amounts on deposit in the Revenue Account, Construction Account, Working Capital Reserve Account, Operating Account and Debt Service Reserve Account maintained by the Agent or its affiliates constitute Prepetition Collateral or the proceeds of Prepetition Collateral and, therefore, is the cash collateral of the Lenders within the meaning of Section 363(a) of the Bankruptcy Code (the "Cash Collateral").

**Relief Requested**

18. By and through this Motion, the Trustee seeks (A) entry of a stipulation and interim order (i) authorizing the use of Cash Collateral, (ii) providing adequate protection of the interests of the Prepetition Lenders and any other purportedly secured party, and (iii) granting related relief; and (B) the scheduling of a final hearing in respect of same. Specifically, the Trustee proposes that the Court authorize the use of Cash Collateral on an interim basis in accordance with the Interim Order which, in summary, provides for the following:

- Use: The Trustee may use the Debtors' cash, including any Cash Collateral, during the period provided in the Interim Order (the "Interim Period") in accordance with and for the purposes defined in the Cash Collateral budget (the "Budget") attached to the Interim Order as Exhibit 1, subject to permitted variances contemplated therein.

7

- Limitations on Use: Notwithstanding the anything contained in the Interim Order, in no event shall the Cash Collateral or the Carveout[2] be used for the payment or reimbursement of any fees, expenses, costs, or disbursements of any of the professionals incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or contested matter, the purpose of which is to seek any order, judgment, determination, or similar relief (a) disputing, disallowing, invalidating, setting aside, avoiding, bifurcating or subordinating in whole or in part the Prepetition Obligations or the Agent's liens and security interests granted pursuant to the Credit Agreement, Security Documents or this Interim Order; (b) seeking to surcharge the Prepetition or Postpetition Collateral; (c) opposing any motion by the Agent and the Lenders for relief from the automatic stay; (d) asserting any other claim or cause of action against the Agent or any of the Lenders seeking any affirmative relief, including but not limited to damages or equitable relief, or (e) preventing, hindering or delaying, whether directly or indirectly, the Agent's enforcement or realization upon any Prepetition Collateral or Postpetition Collateral.

- Adequate Protection: As adequate protection for, and to the extent of, any diminution in the value of the Lenders' interest in the Prepetition Collateral resulting from (x) the use of the Cash Collateral pursuant to Section 363(c) of the Bankruptcy Code, (y) the use, sale, lease, depreciation, decline in market price or other diminution in value of the Prepetition Collateral (other than the Cash Collateral) pursuant to Section 363(c) of the Bankruptcy Code and (z) the imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code (the amount of any such diminution being referred to hereinafter as the "Adequate Protection Obligations"):

    o the Agent and the Lenders are hereby granted (effective as of the Petition Date and without the necessity of the execution of mortgages, security agreements, control agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security interests in, and liens (the "Replacement Liens") on all of the right, title and interest of the Debtors' estates in, to and under all present and after-acquired property of the Debtors' estates of any nature whatsoever except with respect to claims and causes of action under Section 547 of the Bankruptcy Code, including, without limitation, all cash contained in any account of the Debtors' estates, and all rights, claims and other causes of action of the Debtors' estates except for claims and causes of action under Section 547 of the Bankruptcy Code. Subject to the Carveout, said Replacement Liens shall be (x) a first priority perfected lien upon all of the Postpetition Collateral that is not otherwise encumbered by a validly perfected, enforceable, non-avoidable security interest or lien on the Petition Date, (y) a first priority, senior, priming and perfected lien upon (a) that portion of the Postpetition Collateral that is comprised of the Prepetition Collateral

---

[2] Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Interim Order.

and (b) Postpetition Collateral subject to a lien that is junior to the liens securing the Prepetition Obligations and (z) a second priority, junior perfected lien upon all Postpetition Collateral (other than the portion described in the preceding clause (y)), which is subject to a validly perfected and enforceable lien as of the Petition Date; and

- o the Trustee shall (a) immediately pay as adequate protection an amount equal to all accrued and unpaid costs, fees and expenses of the Agent outstanding as of the date hereof (including, without limitation, reasonable fees and expenses of counsel and financial advisors to the Agent) and (b) pay on demand all costs, fees and expenses of the Agent after the date hereof (including, without limitation, reasonable fees and expenses of counsel and financial advisors to the Agent).  Costs, fees and expenses described in (a) and (b) above may relate to, without limitation, the Credit Agreement, the Prepetition Obligations, the monitoring of these Chapter 7 Cases or the enforcement and protection of the rights and interests of the Agent and the Lenders in these Chapter 7 Cases.

- Reporting: As further adequate protection, the Trustee shall provide the following reporting to the Agent (the "Reporting Requirements"):

  - o The Trustee shall provide the Agent with copies of all financial reports, information and other materials required to be delivered to the Agent pursuant to the Credit Agreement and any other information and materials as may be, from time to time, reasonably requested by the Agent;

  - o Commencing on Wednesday, August 17, 2011 and on every Wednesday thereafter, 13-week rolling cash flow projections in the same form as the Budget;

  - o Commencing on Wednesday, August 17, 2011 and on every Wednesday thereafter, a weekly statement showing (A) the ending cash balance on a consolidated basis for the prior week-ending Sunday for the Debtors and (B) the revenue on a consolidated basis for the prior week-ending Sunday; and

  - o Within 10 days of the fiscal month ending August 31, 2011, and within 10 days of the end of every fiscal month thereafter, consolidated financial statements for the Debtors as of the end of the preceding month and year-to-date period, including a statement showing line item variances for such preceding month and year-to-date period as reflected in the Budget and line item variances for such month and year-to-date period, and an explanation of any material variances.

  The Trustee shall permit representatives, agents and/or employees of the Agent or the Lenders to have reasonable access to the premises and non-

9

privileged records of the Debtors' estates and shall cooperate, consult with and provide to such persons all such non-privileged information as they may reasonably request from time to time. At its discretion, the Agent may request, and the Trustee agrees to provide, periodic electronic and telephonic updates to the Agent and the Lenders concerning the operations, business affairs and financial condition of the Debtors. None of the fees, costs and expenses payable pursuant to paragraph 5(a) of the Interim Order shall be subject to separate approval by this Court (but the Court shall resolve any dispute as to the reasonableness of any such fees, costs and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

- Carveout: As used in the Interim Order, the term "Carveout" means (a) the unpaid fees of Trustee, the clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (the "Statutory Fees") and (b) following the occurrence of an Event of Default (defined in the Interim Order), the payment of up to $100,000 of allowed professional fees, costs and expenses incurred by the professionals retained by the Trustee provided that such fees, costs and expenses shall not be incurred with respect to prosecuting any claims or causes of action under Section 547 of the Bankruptcy Code, excluding (i) any professional fees, costs and expenses incurred by a financial advisor or investment bank retained by the Trustee and (ii) any fees, costs and expenses incurred in connection with proceedings or actions against Getty Petroleum Marketing Inc., Lukoil Americas Corporation or any of their successors or affiliates. So long as no Event of Default shall have occurred and be continuing, the Trustee shall be permitted to pay without reduction of the Carveout but subject to the Budget (x) the Statutory Fees and (y) up to $100,000 of allowed professional fees, costs and expenses incurred by the professionals retained by the Trustee provided that such fees, costs and expenses shall not be incurred with respect to prosecuting any claims or causes of action under Section 547 of the Bankruptcy Code, as the same may be due and payable. Nothing herein shall be construed as a waiver of the right of the Agent or any Lender to object to the allowance of any professional fees, costs and expenses incurred by the professionals retained by the Trustee. For the avoidance of doubt, the Agent's liens in the Prepetition Collateral shall survive, and be in effect, during and after the time period this Interim Order is in effect but shall be subject to the Carveout.

- Superpriority of Adequate Protections Obligations: Subject to the Carveout, the Adequate Protection Obligations shall constitute expenses of administration under Sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code (the "507(b) Claims") with priority in payment over any and all administrative expenses now existing or hereafter arising, of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code including, without limitation, Sections 105, 326, 328, 330, 331 and 726 of the Bankruptcy Code, other than the allowed fees and expenses of the Trustee and his duly retained professionals (but only up to the extent provided for in the Budget) excluding any such fees and expenses incurred

with respect to prosecuting claims or causes of action under Section 547 of the Bankruptcy Code, and shall at all times be senior to the rights of any creditor in these Chapter 7 Cases; provided that no proceeds with respect to claims and causes of action under Section 547 of the Bankruptcy Code shall be applied to the Adequate Protection Obligations. Subject to the Carveout, no cost or expense, now existing or after arising, of administration under Sections 105, 503(b) or 507(b) or otherwise, shall be senior to, or pari passu with, the 507(b) Claims of the Lenders arising out of the Adequate Protection Obligations.

- <u>Termination & Default</u>: The Agent's consent to the use of Cash Collateral pursuant to the Interim Order shall terminate (the date of any such termination, the "Termination Date") on the earliest to occur of (x) August 31, 2011 if the Final Order has not been entered by the Court on or before such date, or such later date as the Agent, upon instruction of the Required Lenders, may agree, (y) the first business day after the dismissal of the Chapter 7 Cases or (z) five business days following written notice to the Trustee after the occurrence and continuance of any of the following events ("<u>Events of Default</u>") beyond any applicable grace period:

    o Failure of the Trustee to make a payment to the Agent as and when required by the Interim Order or other failure to comply in any material respect with the terms of the Interim Order and such failure shall continue unremedied for more than two business days after notice thereof;

    o Failure of the Trustee to comply with the Reporting Requirements if not remedied within five business days after notice thereof of any applicable deadline;

    o Failure of the Trustee to comply with any other covenant or agreement specified in the Interim Order (other than those described in clauses (a) and (b) above) and such failure shall continue unremedied for more than five business days after notice thereof;

    o The filing of a motion for a sale of any assets of the Debtors' estates outside the ordinary course of business without the prior written consent of the Agent;

    o The filing of a motion for settlement and compromise of any of the estates' claims against Getty Petroleum Marketing, Inc., Lukoil Americas Corporation or any of their successors or affiliates without the prior written consent of the Agent;

    o The Trustee shall fail to meet any of the payroll, payroll tax, utility, or ad valorem tax obligations specified in the Budget as and when due;

11

- The Trustee shall fail to maintain the Plant (as defined in the Credit Agreement) in a "hot idle" state;

- An event that causes all or substantially all of the Plant to be damaged, destroyed or rendered unfit for normal use occurs;

- The Trustee petitions the Bankruptcy Court to obtain additional financing pari passu or senior to the liens secured by the Agent or Lenders without the prior written consent of the Agent.

- The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Debtors' estates;

- An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying this Interim Order without the consent of the Agent;

- The Trustee shall, without prior written consent of the Agent, create, incur or suffer to exist any postpetition liens or security interests in the Debtors' estates other than (i) those in favor of the Agent, (ii) carriers', warehousemen's, repairmen's or other similar liens, (iii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, (iv) liens arising by operation of law and having a priority by operation of law over the Agent's liens on the Prepetition Collateral or (iv) deposits to secure the payment of postpetition utilities, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

- A claim arising from funded indebtedness shall be granted in any of these Chapter 7 Cases which is pari passu with or senior to the 507(b) Claims of the Agent and the Lenders, except for claims of the type described in the paragraph (10)(l) of the Interim Order; and

- Any judgment in excess of $100,000 as to any postpetition obligation not covered by insurance shall be rendered against the Debtors' estates and the enforcement thereof shall not be stayed; or there shall be rendered against the Debtors' estates a non-monetary judgment with respect to a post-petition event which causes or could reasonably be expected to result in a material adverse change or have a material adverse effect on the ability of the Trustee to perform its obligations under this Interim Order.

The Trustee shall promptly provide notice to the Agent (with a copy to the United States Trustee) of the occurrence of any Event of Default.

Following notice by the Agent of an Event of Default and prior to a Termination Date, the Trustee or any other party of interest, shall be entitled to seek an emergency hearing to be held within such five day period regarding, among other things, the continued use of Cash Collateral. Unless the Court enters an order authorizing the Trustee to continue its use of Cash Collateral at such hearing, the Termination Date shall occur. Upon the Termination Date, the Agent and the Lenders may exercise the rights and remedies available under the Credit Agreement, Security Documents, this Interim Order or applicable law, including, without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral or Postpetition Collateral. The automatic stay under Section 362 of the Bankruptcy Code shall be deemed modified and vacated to the extent necessary to permit such actions. The actions described above may be taken without further order of or application to the Court as the Agent or the Lenders shall, in their discretion, elect. The Agent and the Lenders shall be entitled to apply the payments or proceeds of the Prepetition Collateral in accordance with the provisions of the Credit Agreement. Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Agent and the Lenders under this Interim Order shall survive the Termination Date.

- <u>Section 506(c) Waiver</u>: As the provides sufficient Cash Collateral to cover the cost of preserving the Debtors' estates during the period of the Interim Order, the Trustee shall not (or seek authority from the Court to) surcharge the Prepetition or Postpetition Collateral to recover the costs and expenses of preserving or disposing of the Prepetition or Postpetition Collateral prior to the Termination Date under Section 506(c) of the Bankruptcy Code

- <u>Good Faith</u>: Pursuant to Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code, the Agent and the Lenders are entities that have acted in "good faith" in connection with the negotiation and request for entry of the Interim Order, and each is entitled to the protection provided to such entities under Section 363(m) of the Bankruptcy Code.

**Basis for Relief**

### A. **The Proposed Use Of Cash Collateral Is Appropriate And Should Be Authorized**

19. Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral, and provides, in pertinent part that:

> [t]he trustee may not use, sell, or lease cash collateral ... unless –
> (A) each entity that has an interest in such cash collateral consents;

> or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).[3] Section 105(a) of the Bankruptcy Code also allows that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The Trustee respectfully submits that the proposed use of Cash Collateral is necessary to preserve their assets and property (including the Prepetition Collateral) during these cases, and will avoid immediate and irreparable harm to the Debtors' estates and creditors, including the Lenders. Such use prejudices no one; it affirmatively and directly benefits the estates and creditors by enhancing the prospects of a successful outcome of these cases. Indeed, the Interim Order is the product of extensive negotiations with the Agent and reflects the terms under which the Lenders would consent to the use of Cash Collateral during the Interim Period.

### B. The Proposed Adequate Protection Is Appropriate

20. Section 361(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to: (1) "periodic cash payments" to the extent that such use "results

---

[3] Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title[.]

14

in a decrease in value of such entity's interest in the property;" (2) "additional or replacement lien[s] to the extent that the use [of cash collateral] will cause a decrease in the value of such entity's interest in the property;" and (3) "granting such other relief … as results in the realization by the entity of the indubitable equivalent of such entity's interest in the property." 11 U.S.C. § 361. Bankruptcy courts have broad flexibility under section 361 in deciding what constitutes adequate protection:

> This section specifies the means by which adequate protection may be provided. It does not require the court to provide it. To do so would place the court in an administrative role. Instead, the trustee or debtor in possession will provide or propose a protection method. If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate. The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); *see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.),* 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis.").

21. The principle purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral against diminution in the value of such interest. *See In re Swedeland Dev. Group, Inc.,* 16 F.3d at 564 ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (quoting *In re O'Connor,* 808 F.2d 1393, 1396 (10th Cir. 1987)); *accord In re DeSardi,* 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006) ("The purpose of adequate protection is to assure that the lender's economic position is not worsened because of the bankruptcy case."); *In re Hollins,* 185 B.R. 523, 528 (Bankr. N.D. Tex. 1995) ("Adequate protection seeks to protect a creditor from an [sic] decline in the value of its collateral . . . .").

---

11 U.S.C. § 363(a).

22. However, the Trustee is mindful that the "Court is not obligated to protect the creditor better than it did itself when making the loan and obtaining security." *In re Heatron, Inc.,* 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). The interest to be protected by virtue of the adequate protection requirement is the lesser of the amount of the debt or the value of assets securing the debt as of the Petition Date. *See In re Alyucan Interstate Corp.,* 12 B.R. 803, 808 (Bankr. D. Utah 1981) ("[T]he 'interest in property' entitled to protection is not measured by the amount of the debt but by the value of the lien.").

### (i) The Budgetary Constraints on the Trustee's Use of Cash Collateral are Intended to Adequately Protect the Interests of the Lenders

23. The principal adequate protection for the Lenders is the use of Cash Collateral in accordance with the Budget (subject to permitted variances). Essentially, the Budget provides for expenditures to fund the Trustee's reduced, but necessary and essential, day-to-day costs of the Debtors' operations, which are limited to maintenance of the Facility in its Petition Date "hot idle" state.

24. Courts have routinely held that adequate protection may be demonstrated by a showing that the going concern value of the debtors, or the value of the lender's collateral, is preserved by the debtor's continuing operations and use of cash collateral. *See, e.g., In re JKJ Chevrolet, Inc.,* 117 F.3d 1413, 1413 (4th Cir. 1997) (allowing use of cash collateral to operate automobile dealership as long as continued operations maintained the value of the business); *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1087 (4th Cir. 1986) (allowing use of cash collateral to operate ski resorts where trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations); *In re 499 W. Warren St. Assocs., Ltd. P'ship,* 142 B.R. 53, 56-57 (Bankr. N.D.N.Y. 1992) (finding secured creditor's interest in collateral adequately protected

when cash collateral was applied to normal operating and maintenance expenditures on collateral property); *In re Constable Plaza Assocs., L.P.,* 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor entitled to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral).

25. Here, the proposed cash expenditures are necessary to preserve and maintain the value of the Prepetition Collateral and the interests therein of the Lenders. Moreover, use of the Cash Collateral in the manner and for the purposes proposed will maintain the overall value of the Debtors' ongoing enterprise and enhance the chances of a successful outcome for these cases. If the Trustee is precluded from making expenditures necessary to maintain the Debtors' assets and to initiate, conduct and complete a going concern sale process, or if the Trustee is forced to effect a "fire-sale" liquidation of the Debtors' assets, the Lenders, indeed all creditors — secured and unsecured — will be harmed. *See, e.g., In re Aqua Assocs.,* 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citing *In re Grant Broad. of Philadelphia, Inc.,* 71 B.R. 376, 386-89 (Bankr. E.D. Pa. 1987), aff'd, 75 B.R. 819 (E.D. Pa. 1987), and *In re Alyucan Interstate Corp.,* 12 B.R. at 809-12).

### (ii) The Interim Order Provides for the Payment of the Agent's Professional Fees and Expenses

26. In addition to expenditures necessary to maintain and preserve the Debtors' assets, the Budget also provides for payment of the Agent's reasonable professional fees and expenses of the Agent's professionals, including counsel and financial advisors to the Agent. *In re WorldCom, Inc.,* 2002 WL 1732646, at *3 (S.D.N.Y. 2002) (allowing payment of post-petition interest and fees in accordance with the terms of the credit facility as adequate

protection); *In re Adelphia Communications Corp.,* 368 B.R. 140, 279-80 (Bankr. S.D.N.Y. 2007) (permitting payment expenses and fees to lenders as adequate protection).

### (iv) The Interim Order Requires the Trustee to Provide Financial Reporting to the Agent

27. Financial and other reporting as required by the Interim Order is often a component of the adequate protection provided to secured creditors. *See, e.g., In re 5877 Poplar, L.P.,* 268 B.R. 140, 150 (Bankr. W.D. Tenn. 2001) (finding adequate protection for use of cash collateral where, among other things, the debtors agreed to provide operating reports to the lender and permit inspection of the premises upon lender's reasonable request). The reporting under the Interim Order are set forth above in paragraph 18 and paragraph 5 of the Interim Order. Thus, in addition to the Budget, which may be updated from time to time (the Interim Order requires the weekly delivery of Budget reconciliation statements), the Agent will receive from the Trustee substantially all of the information it was receiving prior to the commencement of these cases.

### (v) The Lenders are Provided Replacement Liens and Superpriority Claims

28. The Interim Order also provides adequate protection to the Lenders in the form of (i) replacement liens on and security interests in (the "Replacement Liens") all of the Debtors' property and assets and proceeds thereof, except for certain excluded assets (see 11 U.S.C. § 361(2) (providing for replacement liens as a form of adequate protection)); and (ii) allowed superpriority claims pursuant to section 507(b) of the Bankruptcy Code, senior to all other administrative claims, except as set forth below. Such adequate protection is commonplace. *See, e.g., MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtor to replace a lien on cash with a lien on property likely to be worth

18

five times as much); *In re Center Wholesale, Inc.,* 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor). We note that the Replacement Liens do not encumber certain excluded assets and, along with the superpriority claims also granted to the Prepetition Lenders as part of their adequate protection, are granted solely to the extent of any net diminution of the value of the Lenders' interests in the Prepetition Collateral resulting from (i) the Debtors' use of Cash Collateral, (ii) the Debtors' use, sale or lease of any other Prepetition Collateral, or (iii) the imposition of the automatic stay. The Replacement Liens and superpriority claims shall also be junior and subject to Carveout and all allowed fees and expenses of the Trustee and his duly retained professionals but only to the extent provided for in the Budget.

29. Here, the Lenders, in addition to retaining a lien on the proceeds of their respective Prepetition Collateral, are also being provided additional adequate protection in the form of Replacement Liens on any other collateral which may be generated during these cases (i.e., postpetition collateral), as well as superpriority claims. *See, e.g., MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtor to replace a lien on cash with a lien on property likely to be worth five times as much); In re Center Wholesale, Inc., 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute adequate protection for the secured creditor).

## Notice

30. Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware, (ii) counsel to the Agent, (iii) all other known secured creditors of the Debtors, (iv) Debtor Bionol Clearfield's 20 largest unsecured creditors (including

19

counsel if known), and (v) all parties requesting notices pursuant to Bankruptcy Rule 2002. The Trustee submits that no other or further notice need be provided.

WHEREFORE, the Trustee respectfully requests the Court to (A) enter of the Interim Order granting the relief requested herein, including (i) authorizing the Trustee's use of Cash Collateral pursuant to the terms of the Interim Order (including the Budget), (ii) finding that the interests of the Lenders are adequately protected, and (iii) granting related relief; (B) schedule a final hearing; and (C) grant to the Debtors such other and further relief as the Court deems just and proper.

Respectfully submitted,

F**OX ROTHSCHILD LLP**

By: */s/ Sheldon K. Rennie*
Sheldon K. Rennie, Esquire
Delaware Bar No. 3772
919 N. Market Street, Suite 1300
Wilmington, DE 19801-3046
(302) 654-7444/Fax (302) 656-8920
srennie@foxrothschild.com

-and-

Michael G. Menkowitz, Esquire
Joshua T. Klein, Esquire
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
(215) 299-2000/Fax (215) 299-2150
mmenkowitz@foxrothschild.com
jklein@foxrothschild.com

Proposed counsel for Alfred T. Giuliano, Chapter 7 Trustee for the estates of Bionol Clearfield, LLC, *et al*.

Dated: August 2, 2011